**Seth H. Row**, OSB No. 021845
seth.row@millernash.com
**Katelyn J. Fulton**, OSB No. 183404
katelyn.fulton@millernash.com
MILLER NASH LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  503.224.5858
Facsimile:  503.224.0155

      Attorneys for Plaintiff The Oregon Clinic, PC

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| THE OREGON CLINIC, PC, an Oregon professional corporation, | Case No.  3:21-cv-00778 |
| Plaintiff, | COMPLAINT |
| v. | (Declaratory Judgment; Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing) |
| FIREMAN'S FUND INSURANCE COMPANY, a California corporation, | |
| Defendant. | JURY TRIAL DEMANDED |

Plaintiff, The Oregon Clinic, PC, for its Complaint, alleges as follows:

Page 1 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

## I. INTRODUCTION

1.      Plaintiff The Oregon Clinic is an Oregon professional corporation consisting of more than thirty (30) medical specialties and subspecialties with over 263 providers practicing at fifty-seven locations in the Portland metro area.  It was founded by physicians in 1994, and is recognized as a premiere specialty care provider in the State of Oregon, with patients coming from around the state for their specialized care.

2.      Beginning in March, 2020, as a result of the presence of the SARS-coV-2 virus (the "Covid-19 virus") in and around its offices; various governmental orders; and the pandemic described below, The Oregon Clinic sustained direct physical loss or damage to property at or near its insured locations, and to dependent properties, resulting in significant interruption of and loss of business income, and costs to ensure patient and employee safety, to repair its damaged property, and to mitigate the loss of income.  The Oregon Clinic turned to its commercial property insurer, Fireman's Fund Insurance Company, for coverage of its insured losses, but Fireman's Fund denied the claim.  The Oregon Clinic brings this action to obtain the insurance benefits to which it is entitled.

## II. PARTIES

3.      The Oregon Clinic is an Oregon professional corporation with its primary business location in Multnomah County, Oregon.  At all material times, The Oregon Clinic was a citizen and resident of the State of Oregon.

/ / /

/ / /

/ / /

Page 2 -      COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

4.      Defendant, Fireman's Fund Insurance Company ("Fireman's Fund") is a California insurance company with its principal place of business in Novato, California.  At all materials times Fireman's Fund was licensed and authorized to issue, and did issue, insurance policies in the State of Oregon including the insurance policy at issue in this litigation.

### III. JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) in that this action involves citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Defendant because Defendant advertised, marketed, sold and distributed policies of insurance in Oregon to Oregon businesses, including the policy of insurance purchased by The Oregon Clinic.  The policy of insurance was delivered to The Oregon Clinic in Oregon.

7.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims, and the effects of Defendant's conduct, occurred in the District of Oregon.  Defendant conducted substantial business, solicited substantial business, and received substantial payments in the District of Oregon.

### IV. FACTS

### The Policy

8.      To protect its business property and income, among other things, The Oregon Clinic purchased an "all risk" "Property–Gard Pinnacle" insurance policy (the "Policy")

/ / /

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

from Fireman's Fund.  The Policy was effective at all times material to this litigation including in particular in March, 2020.

9.    The Oregon Clinic paid, and Defendant accepted, all premiums due under the Policy.  The Policy is a valid and enforceable contract between The Oregon Clinic and Fireman's Fund.

10.    In the Policy, Fireman's Fund promised to pay The Oregon Clinic for loss resulting from all "risks of direct physical loss or damage" to covered property, not excluded by the Policy.  The Policy includes, among others, the following coverages:  *Property Coverage; Business Income and Extra Expense Coverage; Extended Business Income and Extra Expense Coverage; Business Access Coverage; Civil Authority Coverage; Communicable Disease Coverage; Loss Adjustment Expense Coverage; and Ordinance or Law Coverage*.

11.    The Policy's *Property Coverage* provides that Fireman's Fund "…will pay for direct physical loss or damage to **Property Insured**… caused by or resulting from a **covered cause of loss** during the Policy Period."  The Policy defines "**Property Insured**" to include  "**business personal property**," which includes furniture, fixtures, equipment, supplies, electronic data processing equipment, mobile communication equipment, personal effects, tenant's improvements and betterments, and valuable papers and records.

12.    The Policy's *Business Income and Extra Expense* coverage provides that Fireman's Fund "…will pay for the actual loss of **business income** and necessary **extra expense**…[the insured sustains]…due to the necessary **suspension** of [the insured's] **operations** during the **period of restoration** arising from direct physical loss or damage to property at a **location** or within 1,000 feet of such **location,** caused by or resulting from **a covered cause of**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

loss." The Policy defines "**location**" in part as the "legal boundaries of a parcel of property at the address described in the Declarations."

13.    The Policy's *Business Access Coverage* provides that Fireman's Fund will "…pay for the actual loss of **business income** and necessary **extra expense** [the insured sustains] due to the necessary **suspension** of **operations** at a **location** if access to such **location** is impaired or obstructed. Such impairment or obstruction must: (1) Arise from direct physical loss or damage to property other than at such **location;** and (2) Be caused by or result from a **covered cause of loss**; and (3) Occur within [one mile] from such **location**."

14.    The Policy's *Civil Authority Coverage* provides that Fireman's Fund will "…pay for the actual loss of **business income** and necessary **extra expense** [the insured sustains] due to the necessary **suspension** of your **operations** caused by action of civil authority that prohibits access to a **location**. Such prohibition of access to such **location** by a civil authority must: (1) Arise from direct physical loss or damage to property other than at such **location;** and (2) Be caused by or result from a **covered cause of loss**; and (3) Occur within [one mile] from such **location**."

15.    The Policy's *Dependent Property Coverage* provides that Fireman's Fund will "…pay for the actual loss of business income and necessary extra expense [the insured sustains] due to the necessary **suspension** of **operations** during the **period of restoration** at a **location**. The suspension must be due to direct physical loss or damage at the location of a **dependent property**, situated inside or outside the Coverage territory, caused by or resulting from a covered cause of loss." The Policy defines "**dependent property**" as property "operated

/ / /

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

by others upon whom you depend to:  a. Deliver materials or services to you…; b. Accept your products or services…"

16.     The Policy's *Expediting Expense Coverage* provides that Fireman's Fund will "…pay the necessary **expediting expense**… [the insured sustains]…due to direct physical loss or damage to property at a location caused by or resulting from a covered cause of loss." The Policy defines "**expediting expense**" to mean "necessary extra costs, including overtime wages and express freight or other means of transportation, in order to expedite:  a. Emergency or temporary repairs of damaged covered property; or b. Permanent repair or replacement of such damaged property."

17.     The Policy's *Extended Business Income and Extra Expense Coverage* provides that Fireman's Fund will "… pay for the actual loss of **business income [**the insured] sustain[s] during the period that begins on the date property… is actually repaired, rebuilt, or replaced, and **operations** are resumed and ends at the earlier of:  (a) the date you could restore your **operations** with reasonable speed, to the level which would generate the **business income** amount that would have existed if no direct physical loss or damage occurred;" or "(b)" 180 days "after the date **operations** are resumed."

18.     The Policy's *Communicable Disease Coverage* provides that Fireman's Fund will "…pay for direct physical loss or damage to **Property Insured** caused by or resulting from a covered **communicable disease event** at a location including …[certain described costs]."  This Coverage also includes payment for "actual loss of **business income** and necessary **extra expense.**"  The Policy defines "**communicable disease event**" as an event in which a public health authority has ordered that a location be evacuated, decontaminated, or disinfected

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

due to the outbreak of a communicable disease at such location.  "**Communicable disease**" is defined in the Policy to mean any disease, bacteria, or virus that may be transmitted directly or indirectly from human or animal to a human.

19.    The Policy's *Loss Adjustment Expense Coverage* provides that if a covered loss occurs, Fireman's Fund "…will pay the necessary loss adjustment expenses…[the insured]…incur(s) that would not have been incurred had there not been a covered loss."  Under the Policy loss adjustment expenses include, but are not limited to, expenses incurred to document the business income loss or extra expenses sustained; public accountant or certified public accountant fees; the cost of appraisals; or other expenses incurred to obtain loss data in support of The Oregon Clinic's claim.

20.    The Policy's *Ordinance or Law Coverage* provides that Fireman's Fund will pay certain losses and costs of The Oregon Clinic if "**Property Insured** at a **location** sustains direct physical loss or damage caused by or resulting from a **covered cause of loss**; and such covered cause of loss or damage results in enforcement of a covered **ordinance or law**."  The potentially covered losses and costs under the Policy include, but are not limited to, "loss in value to the undamaged portion of property insured;" "loss in value of non-conforming property;" and "increased period of restoration" including "actual loss of **business income** and necessary **extra expense**" during such increased period.  The Policy defines "**ordinance or law**" to mean any ordinance, law, regulation, or rule that is in force at the time of the covered loss or damage and, among other things, regulates the construction, use, occupancy, operation, improvement, replacement, modification, installation or repair of any property.

/ / /

Page 7 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

21.    The Policy defines "**operations**" as "…the usual and customary business activities in the conduct [of the insured's] **business** occurring at the **location**, including the tenability of the **premises**."

22.    The Policy defines "**suspension**" to mean "the slowdown or cessation of [the insured's] business **operations**, or that a part or all of the described **premises** is rendered untenable."

23.    The Policy defines "**location" as** the legal boundaries of a parcel of property at the address described in the Declarations to the Policy.  The Oregon Clinic's offices at issue in this action are described in the Policy's Declarations.

24.    The Policy defines **covered cause of loss** as "…risks of direct physical loss or damage not excluded or limited in this Coverage Form."

25.    The Policy does not define the phrase "risks of direct physical loss or damage" or any of the constituent terms in that phrase.

26.    Under Oregon law, undefined words of common usage are given their plain and ordinary interpretation, considering among other things their dictionary definitions.

27.    The Merriam-Webster Dictionary defines "direct" as "proceeding from one point to another in time or space without deviation or interruption…(and/or) characterized by close logical, causal, or consequential relationship…"[1]  It defines "physical" as "of or relating to natural science…having a material existence…(and/or) perceptible especially through the senses and subject to the laws of nature…"[2]  It defines "loss" as "destruction, ruin…(and/or) the

---

[1] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[2] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

act of losing possession (and/or) deprivation…"[3]  It defines "damage" as "loss or harm from injury to person, property, or reputation…"[4]

28.     The Policy expressly provides that "two or more coverages" of the Policy may apply "to the same loss, damage, or expense."

29.     The Policy also provides other coverages, terms and conditions that may be relevant to the loss sustained by The Oregon Clinic as described herein.

**The Pandemic**

30.     COVID-19 is a severe infectious disease caused by the Covid-19 virus. COVID-19 can cause serious systemic illness and death.[5]  To date, there have been over 159 million confirmed cases of COVID-19 (over 32.4 million of them in the US alone) and over 2.6 million deaths worldwide.[6]  Due to pervasive spread and presence of the Covid-19 virus and COVID-19 across the planet, both are presumed to be present or imminently present everywhere.[7]

31.     The existence and/or presence of the Covid-19 virus and COVID-19 is not simply reflected in reported cases or individuals' positive test results.  The Centers for Disease

---

[3] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[4] Damage, Merriam-Webster, https://www.merriam-webster.com/dictionary/damage.

[5] Tianna Hicklin, *Immune cells for common cold may recognize SARS-COV-2*, NAT. INST. OF HEALTH (Aug. 18, 2020), https://www.nih.gov/news-events/nih-research-matters/immune-cells-common-cold-may-recognize-sars-cov-2 (last visited May 12, 2021).

[6] *Coronavirus Disease 2019 (COVID-19),* CDC, updated Mar. 20, 2021, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited May 12, 2021); *Europe, Southeast Asia, and Eastern Mediterranean COVID Cases:  WHO Coronavirus Disease (COVID-19) Dashboard*, WHO (last updated Mar. 20, 2021), https://covid19.who.int/ (last visited May 12, 2021).

[7] *See, e.g.*, Christopher Ingraham, *At the population level, the coronavirus is almost literally everywhere,* WASH. POST, Apr. 1, 2020, https://www.washingtonpost.com/business/2020/04/01/population-level-coronavirus-is-almost-literally-everywhere/ (last visited May 12, 2021).

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

Control and Prevention ("CDC") estimates that the number of people in the U.S. who have been

infected with the Covid-19 virus is likely to be 10 times higher than the number of reported

cases.[8]  Additionally, at least 40% of people infected with the Covid-19 virus are asymptomatic.[9]

COVID-19 also includes a pre-symptomatic incubation period of up to 14 days, during which

time infected people can transmit the Covid-19 virus to people, into the air and onto surfaces

without having experienced symptoms and without realizing that they are infected.[10]

        32.      Studies have demonstrated that pre-symptomatic individuals have an even

greater ability to transmit the Covid-19 virus than other infected people because they carry the

greatest "viral load."[11]  The National Academy of Sciences has concluded that "the majority of

transmission is attributable to people who are not exhibiting symptoms, either because they are

still in the pre-symptomatic stage or the infection is asymptomatic."[12]

/ / /

---

[8] Lena H. Sun and Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported,* WASH. POST (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited May 12, 2021).

[9] Ellen Cranley, *40% of people infected with covid-19 are asymptomatic, a new CDC estimate says,* BUS. INSIDER (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7 (last visited May 12, 2021).

[10] *See* WHO, *Coronavirus disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited May 12, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, https://doi.org/10.1164/rccm.202006-2136LE (last visited May 12, 2021).

[11] *See, e.g.*, Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19,* 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited May 12, 2021); Lirong Zou, M.Sc., *et al., SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients,* NEW ENG. J. OF MED. (Mar. 19, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2001737 (last visited May 12, 2021).

[12] Meagan C. Fitzpatrick, Alison P. Galvani, Seyed M. Moghadas, Abhishek Pandey, Pratha Sah, Affan Shoukat, and Burton H. Singer, *The implications of silent transmission for the control of COVID-19 outbreaks*, 117 PNAS 30, 17513-15, July 28, 2020 https://www.pnas.org/content/117/30/17513 (last visited May 12, 2021).

Page 10 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

33.     On or about January, 2020, the United States saw its first documented cases of people infected with the Covid-19 virus and people becoming ill with the disease caused by the virus, known as COVID-19.

34.     As early as February 26, 2020, the CDC advised that COVID-19 was spreading freely without the ability to trace the origin of new infections, also known as community transmission or community spread.

35.     COVID-19 is highly contagious, uniquely resilient, and potentially deadly. The degree to which an infectious disease is contagious is measured by $R^0$, a term that defines how many other people will become infected by one person with that disease.  Studies have concluded that one person infected with the Covid-19 virus will infect up to 5.7 others ($R^0 \approx 5.7$), which is much higher than seasonal influenza for example, where on average, one person will infect only 1.3 others ($R^0 \approx 1.3$).[13]

36.     The Covid-19 virus can remain infectious for "much longer time periods than generally considered possible."[14]  In the Journal of Virology, researchers demonstrated that the Covid-19 virus can survive up to 28 days at room temperature (68ºF) on a variety of surfaces including glass, steel, vinyl, plastic, and paper.[15]  A CDC report from March 27, 2020, stated that the Covid-19 virus was identified on surfaces of the cabins on the Diamond Princess cruise ship

---

[13] M. Cevik, C.C.G. Bamford, A. Ho, *COVID-19 pandemic-a focused review for clinicians*, 26 CLIN MICROBIOL INFECT. 7, 842-47 (July 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited May 12, 2021).

[14] Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (2020), https://doi.org/10.1186/s12985-020-01418-7 (last visited May 12, 2021).

[15] *Id.*

Page 11 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

17 days after the cabins were vacated but before they were disinfected.[16]  Numerous other

scientific studies and articles have identified the persistence of the Covid-19 virus on doorknobs,

toilets, faucets and other high-touch points, as well as on commonly overlooked surfaces such as

floors.[17]

      37.    The World Health Organization ("WHO") states that "[t]he disease

spreads primarily from person to person through small droplets from the nose or mouth, which

are expelled when a person with COVID-19 coughs, sneezes, or speaks… People can catch

COVID-19 if they breathe in these droplets from a person infected with the virus… These

droplets can land on objects and surfaces around the person such as tables, doorknobs and

handrails.   People can become infected by touching these objects or surfaces, then touching their

eyes, nose or mouth."[18]

      38.    Reported rates of infection by the Covid-19 virus grew quickly in Oregon.

Multnomah County Situation Reports for COVID-19 stated that by March 31, 2020 there had

been 116 cases and 2 deaths; by April 29, 2020, there had been 696 cases and 42 deaths; and by

May 29, 2020 there had been 1,103 cases and 59 deaths.  As of March 20, 2021, Multnomah

/ / /

---

[16] Leah F. Moriarty, Mateusz M. Plucinski, Barbara J. Marston, et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, 69 MMWR 12, 347-352, March 27, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited May 12, 2021).

[17] Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020,* 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7323510 (last visited May 12, 2021).

[18] *Q&A on coronaviruses (COVID-19)*, World Health Organization, https://web.archive.org/web/20200506094904/https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited May 12, 2021).

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

County reported 33,164 cases and 567 deaths; Washington County reported 22,214 cases and 223 deaths; and Clackamas County reported 19,298 cases and 296 deaths.

39.    Every county where The Oregon Clinic maintains an office has reported positive tests for infection by the Covid-19 virus.

40.    The presence of the Covid-19 virus at The Oregon Clinic's offices, as well as its dependent locations, was statistically certain or near-certain, using statistical modeling based on the known incidences of infection and other information generally used in epidemiology, despite the lack of commercially available tests for fomite or the aerosolized Covid-19 virus, and despite the shortage of tests that could have otherwise been administered to every individual who was on-site at the relevant times.[19]

41.    Early in the course of the spread of the Covid-19 virus, testing was limited, and thus potentially thousands more people were infected than were reported.[20]  Using the testing that was available at that time, local positivity rates clearly demonstrated the pervasiveness of the Covid-19 virus throughout the counties where The Oregon Clinic offices are located.

42.    Epidemiologists have explained that "the percent positive is a critical measure because it gives us an indication of how widespread infection is in the area where the testing is occurring[.]"[21]  It is a crucial indicator of whether a business can safely remain open.

---

[19] *See, e.g.,* Aroon Chande, Seolha Lee, Mallory Harris, Quan Nguyen, Stephen J. Beckett, Troy Hilley, Clio Andris, & Joshua S. Weitz, *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, 4 Nat. Human Behavior, 1313-19 (Nov. 9, 2020), https://doi.org/10.1038/s41562-020-01000-9 (last visited May 12, 2021).

[20] *See, e.g.,* Benedict Carey and James Glanz, *Hidden Outbreaks Spread Through U.S. Cities Far Earlier Than Americans Knew, Estimates Say*, N.Y. Times (Apr. 23, 2020), (updated July 6, 2020), https://nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html (last visited May 12, 2021).

[21] David Dowdy and Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive"*, Johns

Page 13 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

As a threshold for the percent positive being "too high," the WHO stated that the percent positive should remain below 5% for at least two weeks before re-opening.[22]

43.    Oregon experienced an exceptionally high positivity rate:  for the week of March 7-13, 2020, Oregon reported a positivity rate of 7.7%.[23]

44.    No later than March 13, 2020, at least one person physically present in downtown Portland, Oregon, in close proximity to one or more insured locations, was reported to have tested positive for infection by the Covid-19 virus.

45.    While the damage and destruction caused by the original variant of the Covid-19 virus was staggering, completely new and distinct variants of the Covid-19 virus have now emerged that are even more contagious, infectious, persistent and deadly than the original variant of the Covid-19 virus.

46.    These new variants of the Covid-19 virus have been detected in the counties in which The Oregon Clinic has offices.[24]

**Properties of the Covid-19 Virus**

47.    The omnipresence of the Covid-19 virus is enabled by multiple modes of viral transmission, including respiratory droplets, airborne and fomite transmission (*i.e.,*

---

Hopkins Bloomberg School of Public Health Expert Insights (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html (last visited May 12, 2021).

[22] *Id.*

[23] *Oregon's weekly COVID-19 positivity rate is the highest it's been since March*, KGW8 (Aug. 3, 2020), https://www.kgw.com/article/news/health/coronavirus/oregon-weekly-covid-19-positivity-rate-highest-since-march/283-d6bb8928-9df1-4b9c-9a79-4fec4d6ecdac (last visited May 12, 2021).

[24] *Limited data, vaccine concerns: COVID-19 variants and what they mean for Oregon* (March 10 2021), https://www.oregonlive.com/coronavirus/2021/03/limited-data-vaccine-concerns-covid-19-variants-and-what-they-mean-for-oregon.html (last visited May 12, 2021).

Page 14 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

transmission from surfaces and objects).[25]  These transmission methods demonstrate that the Covid-19 virus causes direct physical loss or damage to property.

48.    In addition to being found in air samples,[26] the Covid-19 virus remains stable in body secretions (respiratory, urine, feces), on surfaces, and in sewage, particularly at lower temperatures.[27]

49.    Respiratory transmission of the Covid-19 virus occurs through exposure to an infected person's respiratory particles, such as from saliva or mucus.[28]  Respiratory transmission of the Covid-19 virus is commonly divided into droplets (larger particles that have a transmission range of about six feet) and airborne (smaller particles that can remain suspended in the air for prolonged periods of time) modes of transmission.  Though convenient, this binary division is an oversimplification that underscores transmission risk.[29]  Humans produce a wide range of particle sizes when coughing, sneezing, talking, singing, or otherwise dispersing droplets, with pathogens predominating in the smallest particles.[30]  Respiratory particles

---

[25] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited May 12, 2021).

[26] Zhen-Dong Guo, Zhong-Yi Wang, Shou-Feng Zhang, Xiao Li, Lin Li, Chao Li, Yan Cui, Rui-Bin Fu, Yun-Zhu Dong, Xiang-Yang Chi, Meng-Yao Zhang, Kun Liu, Cheng Cao, Bin Liu, Ke Zhang, Yu-Wei Gao, Bing Lu, Wei Chen, *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China*, 2020, 26 EMERG. INFECT. DIS. 7, 1583-91 (July 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7323510/ (last visited May 12, 2021).

[27] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. OF MED. VIROLOGY 11, 2498-510 (June 2020), https://doi.org/10.1002/jmv.26170 (last visited May 12, 2021).

[28] *Id.*

[29] Kevin P. Fennelly, *Particle sizes of infectious aerosols:  implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited May 12, 2021).

[30] *Id.*

Page 15 -   COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

produced by the average person can travel almost 20 feet by sneezing.[31]  An M.I.T. researcher

has found that virus-laden "clouds" containing clusters of droplets can travel 23 to 27 feet.[32]

50.     Airborne transmission involves the spread of the infectious agent caused

by the dissemination of droplet nuclei (aerosols) from, for example, exhaled breath, that remain

infectious when suspended in the air over long distances and time.[33]  These tiny particles can

remain suspended "for indefinite periods unless removed by air currents or dilution

ventilation."[34]  As a result, the risk of disease transmission increases substantially in enclosed

environments, such as medical offices, as compared to outdoor settings.[35]

51.     The WHO and the scientific community have studied the spread of the

Covid-19 virus through aerosols in indoor settings via air circulation systems.  For example, the

CDC published a research letter concluding that a restaurant's air conditioning system triggered

the transmission of the Covid-19 virus, spreading it to people who sat at separate tables

---

[31] *Id.*

[32] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions, Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 18, 1837-38, Mar. 26, 2020, https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited May 13, 2021).

[33] *Id; see also* Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, TIME, Aug. 25, 2020, https://time.com/5883081/covid-19-transmitted-aerosols/ (last visited May 13, 2021); Ramon Padilla & Javier Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, (last updated Sept. 21, 2020), www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/ (last visited May 13, 2021); Wenzhao Chen, Nan Zhang, Jianjian Wei, Hui-Ling Yen, and Yuguo Li, *Short-range airborne route dominates exposure of respiratory infection during close contact*, 176 BLDG. AND ENV'T (June 2020), https://www.sciencedirect.com/science/article/pii/S0360132320302183 (last visited May 13, 2021).

[34] Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited May 13, 2021).

[35] Muge Cevik, Julia L Marcus, Caroline Buckee, & Tara C Smith, *Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) Transmission Dynamics Should Inform Policy*, CLINICAL INFECTIOUS DISEASES (2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa1442/5910315 (last visited May 13, 2021).

Page 16 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

downstream of the restaurant's airflow.[36]  Moreover, a study detected the Covid-19 virus inside

the HVAC system connected to hospital rooms of patients sick with COVID-19.  The study

found the Covid-19 virus in ceiling vent openings, vent exhaust filters and ducts located as much

as 56 meters (over 183 feet) from the rooms of the sick COVID-19 patients.[37]

      52.      Additionally, the CDC has stated that "there is evidence that under certain

conditions, people with COVID-19 seem to have infected others who were more than 6 feet

away" and infected people who entered the space shortly after the person with COVID-19 had

left.[38]  A recently published (February 2021) systematic review of airborne transmission of the

Covid-19 virus corroborated the CDC's concerns and recommended procedures to improve

ventilation of indoor air environments to decrease bioaerosol concentration and reduce the

Covid-19 virus's spread.[39]

      53.      The CDC has recommended "ventilation interventions" to help reduce

exposure to the airborne Covid-19 virus in indoor spaces, including increasing airflow and air

---

[36] Jianyun Lu, Jieni Gu, Kuibiao Li, Conghui Xu, Wenzhe Su, Zhisheng Lai, Deqian Zhou, Chao Yu, Bin Xu, and Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China*, 2020, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited May 13, 2021); *see also* Keun-Sang Kwon, Jung-Im Park, Young Joon Park, Don-Myung Jung, Ki-Wahn Ryu, and Ju-Hyung Lee, *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://doi.org/10.3346/jkms.2020.35.e415 (last visited May 13, 2021).

[37] Karolina Nissen, Janina Krambrich, Dario Akaberi, Tobe Hoffman, Jiaxin Ling, Ake Lundkvist, Lennart Svensson & Erik Salaneck, *Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards*, SCI REP 10, 19589 (Nov. 11, 2020), https://doi.org/10.1038/s41598-020-76442-2 (last visited May 13, 2021)

[38] CDC, *How COVID-19 Spreads* (last updated May 10, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 13, 2021).

[39] Zahra Noorimotlagh, Neemat Jaafarzadeh, Susana Silva Martínez, & Seyyed Abbas Mirzaee, *A systematic review of possible airborne transmission of the COVID-19 virus (SARS-CoV-2) in the indoor air environment*, 193 ENV'T RSCH. 110612, 1-6 (Feb. 2021), https://www.sciencedirect.com/science/article/pii/S0013935120315097?dgcid=rss_sd_all (last visited May 13, 2021).

Page 17 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

filtration (such as with high-efficiency particulate air ("HEPA") fan/filtration systems).[40]  These

and other remedial measures can be implemented, at high cost and extra expense, to reduce the

amount of the Covid-19 virus present in the space and to make property safe for its intended use.

These extreme measures demonstrate that the Covid-19 virus and COVID-19 cause direct

physical loss, damage or destruction to interior spaces.  And even then, those interventions, at

most, reduce – but do not eliminate – the aerosolized Covid-19 virus in an indoor space.

54.    The Covid-19 virus may also be transmitted to people from physical

objects, materials or surfaces.  "Fomites" are physical objects or materials that carry, and are

capable of transmitting infectious agents, altering these objects to become vectors of disease.[41]

Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-

hand and from hand-to-mouth.[42]

55.    The WHO has described fomite transmission as follows:

Respiratory secretions or droplets expelled by infected individuals
can contaminate surfaces and objects, creating fomites
(contaminated surfaces).  **Viable SARS-CoV-2 virus and/or RNA
detected by RT-PCR can be found on those surfaces for
periods ranging from hours to days**, depending on the ambient
environment (including temperature and humidity) and the type of
surface, in particular at high concentration in health care facilities
where COVID-19 patients were being treated.  Therefore,
transmission may also occur indirectly through touching surfaces
in the immediate environment or objects contaminated with virus
from an infected person . . . .[43] (Emphasis added).

---

[40] CDC, *Ventilation in Buildings* (last updated March 23, 2021), https://www.cdc.gov/coronavirus/2019-
ncov/community/ventilation.html#:~:text=HEPA%20filters%20are%20even%20more,with%20SARS%2DCoV%2
D2 (last visited May 13, 2021).

[41] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/fomite (last visited May 13, 2021).

[42] CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus
Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIONS DISEASES 6 (June
2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited May 13, 2021).

[43] *See, e.g.*, WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020),

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

56.     In addition to studies cited by the WHO,[44] numerous other studies and scientific articles have discussed fomite transmission as a mode of virus transmission, including, but not limited to:

a.      A study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall in China.[45]

b.      A National Institutes of Health study published in the New England Journal of Medicine finding that the Covid-19 virus survives up to 4 hours on copper, up to 24 hours on cardboard, and up to 3 days on plastic and stainless steel, and suggesting that people may acquire the virus through the air and after touching contaminated objects.[46]  Indeed, another insurance company, Zurich, republished the study on its website and restated the study's conclusion when discussing the fomite transmission of the Covid-19 virus in a workplace.[47]

c.      An American Society for Microbiology article discussing fomite infection as involving both porous and non-porous surfaces, and occurring through a fomite's contact with bodily secretions, hands, aerosolized virus from talking, sneezing, coughing, etc., or

https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited May 13, 2021).

[44] *Id.*

[45] CDC, Jing Cai, Wenjie Sun, Jianping Huang, Michelle Gamber, Jing Wu, Guiqing He, *Indirect Virus Transmission in Cluster of COVID-19 Cases*, Wenzhou, China, 2020, 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited May 13, 2021).

[46] National Institutes of Health, *New coronavirus stable for hours on surfaces* (May 13, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited May 13, 2021).

[47] RiskTopics, *Cleaning and Disinfecting Plans During COVID-19 Outbreak* (April 2020), https://www.zurich.com/-/media/project/zurich/dotcom/industry-knowledge/covid-19/docs/cleaning-and-disinfecting-during-covid-19-outbreak-rt.pdf?la=en&rev=e3c9d0882ef14be7b77587a4a95749a2 (last visited May 13, 2021).

Page 19 -    COMPLAINT

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

other airborne viral particles that settle after a disturbance of a fomite (*e.g.*, shaking a contaminated textile such as clothing merchandise).[48]  According to the researchers, "[o]nce a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together)."[49]  Generally, frequently touched surfaces can become highly transmissive fomites.[50]

        d.     A CDC research letter reporting that the Covid-19 virus can remain viable on polystyrene plastic, aluminum, and glass for 96 hours in indoor living spaces.[51]

        e.     A *Journal of Hospital Infection* article citing studies revealing that human coronaviruses can persist on inanimate surfaces like metal, glass, or plastic for up to 9 days.[52]

        57.     Importantly, the Covid-19 virus has been detected on environmental objects and surfaces from symptomatic, pre-symptomatic and asymptomatic individuals.[53]  Fomites transform the surface of property into a potentially deadly transmission device.  A study

---

[48] Stephanie A. Bone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, 73 APPLIED AND ENVIRONMENTAL MICROBIOLOGY 6, 1687-96 (Mar. 2007) https://aem.asm.org/content/73/6/1687 (last visited May 13, 2021).

[49] *Id.*

[50] *Id.*

[51] CDC, Boris Pastorino, Franck Touret, Magali Gilles, Xavier de Lamballerie, and Rémi N. Charrel, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020), https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article (last visited May 13, 2021).

[52] G. Kampf, D. Todt, S. Pfaender, E. Steinmann, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. OF HOSPITAL INFECTION 104, 246-51 (2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited May 13, 2021).

[53] *See* WHO, *Coronavirus disease 2019 (COVID-19) Situation Report - 73* (Apr. 2, 2020), https://apps.who.int/iris/bitstream/handle/10665/331686/nCoVsitrep02Apr2020-eng.pdf?sequence=1&isAllowed=y (last visited Mar. 20, 2021); Minghui Yang , Liang Li , Ting Huang, Shaxi Li, Mingxia Zhang, Yang, Yujin Jiang, Xiaohe Li, Jing Yuan, and Yingxia Liu, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, https://doi.org/10.1164/rccm.202006-2136LE (last visited May 13, 2021).

Page 20 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

published in the Journal of Epidemiology and Infection demonstrated that after lockdown in the

United Kingdom, Covid-19 virus transmission via fomites may have contributed to as many as

25% of deaths in that region.[54]

58.    Accordingly, the presence of the Covid-19 virus in and on property,

including in indoor air, on surfaces, and on objects, causes direct physical loss or damage to

property by causing physical harm to and altering property and otherwise making physical

property incapable of being used for its intended purpose.

59.    Among other things, the presence of the Covid-19 virus transforms

everyday surfaces and objects into fomites, causing a tangible change of the property into a

transmission vehicle for disease from one host to another.  The WHO's description of fomite

transmission expressly recognizes this physical alteration of property, describing viral droplets as

"**creating** fomites (contaminated surfaces)"[55] (emphasis added).  "Creating" involves making or

bringing into existence something new[56] – such as something that is in an altered state from what

it was before the Covid-19 virus was present on, in and around the property.

/ / /

/ / /

---

[54] A. Meiksin, *Dynamics of COVID-19 transmission including indirect transmission mechanisms:  a mathematical analysis*, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 2020),
https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-of-covid19-transmission-including-indirect-transmission-mechanisms-a-mathematical-analysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited May 13, 2021).

[55] *See, e.g.,* WHO, *Transmission of SARS-CoV-2: implications for infection prevention precautions* (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited May 13, 2021).

[56] *See, e.g.,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/create (last visited May 13, 2021).

Page 21 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

60.     The Covid-19 virus adheres to surfaces and objects, harming and physically changing and physically altering those objects by becoming a part of their surface and making physical contact with them unsafe for their ordinary and customary use.  Once the Covid-19 virus is in, on, or near property, it is easily spread by the air, people and objects, from one area to another, causing additional direct physical loss or damage.

61.     Additionally, the presence of the dangerous and potentially fatal Covid-19 virus in and on property, including in indoor air, on surfaces, and on objects, renders the property lost, unsafe and unfit for its normal usage.  Respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenable, and uninhabitable.

**The Covid-19 Virus Cannot be Eliminated from Property by Routine Cleaning**

62.     A number of studies have demonstrated that the Covid-19 virus is "much more resilient to cleaning than other respiratory viruses so tested."[57]  The measures that must be taken to remove the Covid-19 virus from property are significant, and far beyond ordinary or routine cleaning.

63.     The efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the decontaminating agent, dilution, temperature, and pH, among many others.  Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[58]

/ / /

---

[57] *Id*.

[58] *Id.*

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

64.     Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents.  The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[59]

65.     In order to be effective, cleaning and decontamination procedures require strict adherence to protocols not necessarily tested under "real life" or practical conditions, where treated surfaces or objects may not undergo even exposure or adequate contact time.[60]  Studies of coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[61]

66.     When considering disinfection and decontamination, the safety of products and procedures must be considered as well, due to the risks of harmful chemical accumulation, breakdown of treated materials, flammability, and potential for allergen exposure.[62]

67.     Studies have demonstrated that the Covid-19 virus can survive on fabrics and be transferred to skin and other surfaces, "suggesting it is biologically plausible that . . . infectious diseases can be transmitted directly through contact with contaminated textiles."[63]

---

[59] *Id.*

[60] *Id*.

[61] Joon Young Song, Hee Jin Cheong, Min Joo Choi, Ji Ho Jeon, Seong Hee Kang, Eun Ju Jeong, Jin Gu Yoon, Saem Na Lee, Sung Ran Kim, Ji Yun Noh, & Woo Joo Kim, *Viral Shedding* and *Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 252-5 (2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited May 13, 2021).

[62] *Id.*

[63] Lucy Owen and Katie Laird*, The role of textiles as fomites in the healthcare environment: a review of the infection control risk*, 8 PEERJ. LIFE AND ENV'T e9790, 1-35 (2020), https://peerj.com/articles/9790/ (last visited May 13, 2021).

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

Given the inadequacy of conventional cleaning procedures, disinfection and decontamination measures include, but are not limited to, the use of harsh chemicals to perform deep disinfection, the removal and disposal of porous materials like clothing, cloth and other fabrics, and making changes to air filtration systems, and redesigning interior spaces, all performed at great cost and expense to property owners.  These measures, among others, demonstrate that the Covid-19 virus causes physical loss or damage to property.

68.     Many of the surfaces and materials discussed in the studies and articles cited above are used throughout The Oregon Clinic's offices and as part of its operations, including plastics, glass, metals, and cloth and fabrics such as clothing.  Similarly, these surfaces and materials are used in virtually all office buildings, hospitals, clinics and other businesses and amenities throughout Oregon, including at offices and medical locations that are The Oregon Clinic's dependent properties.

69.     Moreover, the aerosolized Covid-19 virus particles cannot be eliminated by routine cleaning.  Cleaning surfaces in an indoor space will not remove the aerosolized Covid-19 virus particles from the air that people can inhale and become infected with the Covid-19 virus - no more than cleaning friable asbestos particles that have landed on a surface from that surface will remove the friable asbestos particles suspended in the air that people can inhale and develop asbestos-related diseases.

70.     Moreover, given the ubiquity and pervasiveness of the Covid-19 virus, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the Covid-19 virus from entering an indoor space and exhaling millions of additional Covid-19 virus particles into the air, further:  (a) filling the air with the aerosolized Covid-19 virus that can

Page 24 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

be inhaled, sometimes with deadly consequences; and (b) depositing Covid-19 virus particles on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

## The Public Orders

71.    Beginning in March, 2020, Oregon Governor Kate Brown, the Oregon Health Authority, Federal authorities and other local authorities began issuing certain orders and directives which, among other things, restricted access to, tenability of, utilization of, and operation of The Oregon Clinic's office and clinical locations.

72.    Among other things, these orders warned the public and businesses about the dangers of the Covid-19 virus; directed people not to travel unless necessary; and to social distance from other people, which had the effect of restricting or eliminating the ability of The Oregon Clinic to use its facilities.

73.    For example, on March 17, 2020, Governor Brown issued Executive Order 20-08, which stated in part:

> COVID-19 may cause respiratory disease leading to serious illness or death.  The World Health Organization considers COVID-19 to be a global pandemic. *COVID-19 spreads person-to-person through coughing, sneezing, close personal contact, including touching a surface with the virus on it and then touching your mouth, nose, or eyes.*
>
> State and local public health officials advise that the virus is circulating in the community and expect the number of cases to increase. The United States Centers for Disease Control and Prevention (CDC) reports that COVID-19 is most contagious when the individual is most symptomatic, but may also spread before symptoms appear. CDC recommends measures to limit spread of the disease in the community, including limitations on events and gatherings.
>
> (Emphasis added.)

Page 25 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

74.    As another example, on March 19, 2020, Oregon Governor Kate Brown issued Executive Order 20-10, prohibiting "elective and non-urgent" medical procedures that utilized personal protective equipment (PPE).  Executive Order 20-10 specifically applied to "outpatient clinics."

75.    Additionally, on March 23, 2020, Oregon Governor Kate Brown issued Executive Order 20-12, commonly referred to as the "Stay Home, Save Lives" Order, which directed individuals to stay home to the greatest extent possible and required social distancing.

76.    On April 27, 2020, Oregon Governor Kate Brown issued Executive Order No. 20-22, which allowed the measured resumption of non-urgent health care procedures under certain conditions, effective May 1, 2020.

77.    Subsequently, the Oregon Health Authority issued a Guidance on Resumption and Continued Provision of Non-Emergent and Elective Procedures in Medical and Dental Offices, which provided for certain requirements, including prioritizing procedures, implementing physical distancing measures, pre-screening patients, the use of tele-medicine, and following strict infection control policies as recommended by the Centers for Disease Control.

**The Covid-19 Virus, the Pandemic, and the
Public Orders Trigger Coverage Under the Policy**

78.    Through November, 2020, approximately twenty-two of The Oregon Clinic's employees or patients that have been on The Oregon Clinic's insured property since the beginning of the pandemic have confirmed that they were infected with the Covid-19 virus while they were on insured premises.  Given the high percentage of persons infected by the Covid-19 virus who are asymptomatic, it is certain or near-certain that the actual number of The Oregon Clinic employees or patients infected with the Covid-19 virus that have been in or on The

Page 26 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

Oregon Clinic's inured property since the beginning of the pandemic is substantially greater than the number of employees and patients known to have been infected with the Covid-19 virus.

79.    Out of The Oregon Clinic's five largest office/clinic locations, three are in Multnomah County, Oregon and two are in Washington County, Oregon.

80.    Many of The Oregon Clinic's offices are in buildings with common areas in which large numbers of people congregate or pass through, within 1,000 feet of The Oregon Clinic's offices.

81.    In light of the number of patients and staff in The Oregon Clinic's offices and the common areas of the buildings in which those offices are located, how highly contagious the Covid-19 virus is, the reported rate of infection in the areas in which The Oregon Clinic had its offices in March, 2020, what is known about the reported rate of infection substantially undercounting the actual rate of infection in the early months of the pandemic, and other factors, it is statistically certain or near-certain that individuals in The Oregon Clinic's offices and/or the common areas of the buildings in which those offices are located were infected with the Covid-19 virus at the time they were on insured premises in early March, 2020, prior to the effective dates of the governmental orders referred to above and prior to The Oregon Clinic's suspension of operations.

82.    It is therefore also statistically certain or near-certain that the Covid-19 virus was continuously dispersed into the air and on physical surfaces and other property in, on, and within 1,000 feet of The Oregon Clinic's offices, in early March 2020, and thereafter.

83.    The continuous dispersal of the Covid-19 virus into the air and onto physical surfaces and other property rendered The Oregon Clinic's cleaning practices ineffective

Page 27 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

at removing the virus from surfaces and from the air inside The Oregon Clinic's offices,

requiring physical and other changes to The Oregon Clinic's insured property, and practices.

84.    The presence of the Covid-19 virus in, on and around insured property

therefore also caused direct physical loss or damage to The Oregon Clinic's business personal

property.

85.    The Oregon Clinic's dependent properties, and specifically hospitals and

other surgery centers that receive The Oregon Clinic's services, have similarly suffered direct

physical loss or damage as a result of the presence of the Covid-19 virus in or on such dependent

properties.

86.    The presence of the Covid-19 virus in, on and around insured property and

dependent properties therefore caused direct physical loss or damage to The Oregon Clinic's

insured property (and specifically, the offices in which The Oregon Clinic provides services to

its patients), and The Oregon Clinic's dependent properties, leading to the necessary suspension

of operations at insured locations and dependent properties, which has resulted in business

income loss and other loss covered by the Policy.

87.    And or in the alternative, the Public Orders referred to above, and others,

caused direct physical loss or damage that triggers coverage under the Policy.

88.    The Public Orders caused the physical loss of or to The Oregon Clinic's

insured property and dependent properties in that they made portions of those properties

(including the portions of offices or other facilities used for elective or non-urgent procedures;

and those physical spaces that could not accommodate social distancing or were otherwise

unsuitable due to requirements of the Public Orders) unusable, untenable, inaccessible, and

Page 28 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

devoid of functionality; and limited the use of all or portions of the insured properties and dependent properties by requiring social distancing and other measures; and required the physical alteration of insured properties and dependent properties to comply with various requirements of the Public Orders.

89.    And or in the additional alternative, the Public Orders constitute "action of civil authority that prohibits access" to insured property, in that they arose from direct physical loss or damage to property other than insured property, were "caused by or result from" a cause of loss not excluded by the Policy (specifically, the discovery or presence of the Covid-19 virus), within one mile of insured property, and prohibited access to those portions of the insured's property that were used for non-essential medical services and/or those portions of the insured's property that could not comply with the Public Orders.

90.    And or in the additional alternative, The Oregon Clinic necessarily suspended operations at one or more insured locations because access to such locations was impaired, arising from direct physical loss or damage to property other than insured property, and caused by or resulting from a cause of loss not excluded by the Policy (specifically, the discovery or presence of the Covid-19 virus), within one mile of insured property

91.    The direct physical loss or damage described above and the impacts of that direct physical loss or damage triggers multiple coverages under the Policy including without limitation: *Property Coverage*; *Business Income and Extra Expense*; *Business Access Coverage; Civil Authority Coverage*; *Dependent Property Coverage*; *Expediting Expense Coverage; Extended Business Income and Extra Expense Coverage; Loss Adjustment Expense Coverage;* and *Ordinance or Law Coverage.*

Page 29 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

**The Impact of the Covid-19 Virus, the Pandemic, and the Public Orders on
The Oregon Clinic's Use of Its Insured Property, Its Operations, and Its
Expenditures to Minimize Loss or Damage**

92.    The direct physical loss or damage to The Oregon Clinic's insured property described above made it necessary for The Oregon Clinic to suspend operations, incur extra expense, undertake costly efforts to protect and preserve property from further damage or loss including making physical alterations to its property, and, after reopening its clinics, to continue to suspend operations and incur expense.

93.    The impact of the direct physical loss or damage described above on The Oregon Clinic's operations was immediate and dramatic.  Most medical services offered by The Oregon Clinic are provided on a fee-for-service basis.  One way to assess The Oregon Clinic's business activity, and thus its business income, is to measure office/clinic foot traffic.  In the first two weeks of March, 2020, the patient count for all of The Oregon Clinic's facilities was frequently over 1,800 per day.  After mid-March, 2020, patient visits to The Oregon Clinic's offices dropped drastically, including occasionally as few as 300 patient visits per day.

94.    The suspension of The Oregon Clinic's operations described above necessitated by the direct physical loss or damage to its insured premises caused significant business income loss through the loss of fees for elective and non-urgent procedures that could not take place, and through loss of fees due to limitations of utilization of The Oregon Clinic's facilities due to social distancing and other requirements.

95.    In addition, due to the direct physical loss or damage described above, The Oregon Clinic has been required to make physical changes to its offices, and purchase and alter business personal property, to prevent further direct physical loss or damage, to minimize the

Page 30 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

suspension of The Oregon Clinic's operations, and to preserve and protect The Oregon Clinic's property.

96.    In addition, due to the direct physical loss or damage described above, The Oregon Clinic was further required to make certain changes to its policies and procedures, with the net effect of reducing the number of patients that can be served every day, resulting in continued loss of business income and other loss even after The Oregon Clinic was permitted to provide a full range of services to its patients.

97.    In addition, due to the direct physical loss or damage described above, The Oregon Clinic has also incurred expenses to acquire services and other items to prevent further direct physical loss or damage, to minimize the suspension of The Oregon Clinic's operations, and to preserve and protect The Oregon Clinic's property.

98.    The Oregon Clinic has or will additionally incur costs covered as Loss Adjustment Expenses under the Policy, to calculate its losses as a result of the direct physical loss or damage to insured and/or dependent property, or prohibition of access to insured property.

### The Impact of the Covid-19 Virus, the Pandemic, and the Public Orders on The Oregon Clinic's Dependent Properties

99.    The Covid-19 virus, the pandemic, and the Public Orders discussed above had a similar impact on The Oregon Clinic's "dependent properties," including but not limited to hospitals and surgery centers.

100.    A considerable percentage of The Oregon Clinic's providers are surgeons or proceduralists, who depend on access to hospitals and surgery centers to perform surgeries and procedures.

Page 31 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

101.    The hospitals and surgery centers that receive those providers' services are "dependent properties" as described in the Policy.

102.    Due to the Covid-19 virus, the pandemic, and the Public Orders, multiple hospitals and surgery centers closed their facilities to The Oregon Clinic's providers, except for urgent cases, contributing to the loss of business income described below.

103.    This necessary suspension of operations by The Oregon Clinic's dependent properties was due to direct physical loss or damage:  the presence of the Covid-19 virus and, or in the alternative, the Public Orders.

104.    The suspension of operations by dependent properties further contributed to The Oregon Clinic's loss of business income.

**The Oregon Clinic's Financial Losses**

105.    As a result of the direct physical loss or damage to The Oregon Clinic's insured property and dependent properties as described above, and prohibition of access to its locations, fewer patients could be seen at The Oregon Clinic's offices, and none, or fewer, elective and non-urgent procedures could be performed at The Oregon Clinic's properties or dependent properties.  This had a dramatic impact on The Oregon Clinic's revenues.  One result of the drop in revenue and patient visits was that approximately 80% of The Oregon Clinic's employees had to be furloughed or had their hours reduced in the spring of 2020.

106.    As a result of the direct physical loss or damage to The Oregon Clinic's insured property and dependent properties as described above, and prohibition of access to its locations, during the period of restoration The Oregon Clinic's net revenues dropped by $20,170,000.  The Oregon Clinic incurred other and additional losses after the period of

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

restoration during which The Oregon Clinic attempted to restore operations to generate the business income amount that would have existed if no direct physical loss or damage had occurred.

107.    As a result of the direct physical loss or damage described above, and to attempt to minimize its extended business income loss, to prevent further direct physical loss or damage to insured property, and to preserve and protect its insured property, The Oregon Clinic has incurred costs and expense in an amount to be proven at trial but not less than $477,000, including expenses for supplies to control the spread of the Covid-19 virus and to comply with Public Orders, for software licensing and other similar expenses, and for alterations to The Oregon Clinic's physical facilities including disposing of and/or purchasing business personal property and making other physical alterations.

108.    The Oregon Clinic has also incurred or will incur costs to determine its losses under the Policy.

### The Oregon Clinic's Insurance Claim and Fireman's Fund's Denial

109.    On or about March 17, 2020, The Oregon Clinic provided timely written notice to Fireman's Fund of its insurance coverage claims related to the Covid-19 virus, the pandemic, and the Public Orders.

110.    Fireman's Fund thereafter performed a limited and perfunctory investigation of The Oregon Clinic's claim.

111.    On or about May 13, 2020, Fireman's Fund provided a written response denying coverage for The Oregon Clinic's claim.  At the heart of Fireman's Fund's denial was

/ / /

Page 33 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

its conclusion that there was no "…direct physical loss or damage to property at Oregon Clinic's locations or within 1,000 feet of such locations."

112.    The terms "direct physical loss or damage to property" are not defined in the Policy.  In applying its own interpretation to these terms, Fireman's Fund did not construe them in favor of the insured, The Oregon Clinic, but instead construed them in a manner that favored only Fireman's Fund's interests.  Fireman's Fund has refused to reconsider its interpretation of its Policy in light of Oregon law.

113.    On information and belief, Fireman's Fund has a custom and practice of denying all of its insureds' claims based upon the same unreasonable and self-favoring interpretation of its property insurance policies, and specifically adopting an interpretation of the phrase "direct physical loss or damage" as not applying to the presence or suspected presence of the Covid-19 virus, the incidence of COVID-19, or governmental closure orders.

## V. FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

114.    The Oregon Clinic realleges and incorporates by reference the allegations in each paragraph above as if fully alleged herein.

115.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights, duties and other legal relations of the parties to this dispute.

116.    An actual and justiciable controversy has arisen between The Oregon Clinic and Fireman's Fund as to their respective rights and duties under the Policy.  Resolution of the dispute over the parties' respective rights and duties under the Policy is necessary.

/ / /

Page 34 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

117.    The Oregon Clinic alleges and contends that it is entitled to insurance coverage under the Policy, including under one or more of the following coverages: *Property Coverage*; *Business Income and Extra Expense*; *Business Access Coverage; Civil Authority Coverage*; *Dependent Property Coverage*; *Expediting Expense Coverage; Extended Business Income and Extra Expense Coverage; Loss Adjustment Expense Coverage;* and *Ordinance or Law Coverage*.

118.    Fireman's Fund contends that there is no coverage for The Oregon Clinic's losses under any of the coverages listed above, or under any other portion of the Policy.

119.    The Oregon Clinic seeks a declaratory judgment declaring that Fireman's Fund has breached the Policy and that The Oregon Clinic's losses described above are covered under the coverages listed above.

120.    As a result of Fireman's Fund's failure to acknowledge its coverage obligations, The Oregon Clinic has been required to retain counsel and incur attorney fees and other costs to bring this declaratory judgment claim, for which Fireman's Fund is liable pursuant to, among other laws, ORS 742.061.

## VI. SECOND CLAIM FOR RELIEF

### (Breach of Contract)

121.    The Oregon Clinic realleges and incorporates by reference the allegations in each paragraph above, as if fully set forth herein.

/ / /

/ / /

/ / /

Page 35 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

122.    The Oregon Clinic paid substantial premiums to Fireman's Fund in consideration for Fireman's Fund's promise to pay The Oregon Clinic's claims for business income loss and other losses covered by the Policy.  The Policy constitutes a contract between the parties.

123.    The Oregon Clinic complied with all conditions to coverage under the Policy with regard the losses claimed herein, excepting any that were waived or excused.

124.    Fireman's Fund breached its express and implied duties under the Policy by, among other things, denying coverage under the Policy for the losses claimed by The Oregon Clinic herein.

125.    As a result of Fireman's Fund's breach of the Policy, The Oregon Clinic has been damaged in an amount to be proven at trial, but not less than $20,647,000.

126.    As a result of Fireman's Fund's breach, The Oregon Clinic has been required to retain counsel and incur attorney fees and other costs, for which Fireman's Fund is liable pursuant to, among other laws, ORS 742.061.

## VII. THIRD CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing)

127.    The Oregon Clinic realleges and incorporates by reference the allegations in each paragraph above as if fully set forth herein.

128.    Every contract, including the Policy, contains an obligation of good faith and fair dealing, performance, and enforcement.  Fireman's Fund had discretion in its performance of certain obligations under the Policy.

/ / /

Page 36 -    COMPLAINT

4825-1022-7946.1

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

129.    In considering and responding to The Oregon Clinic's insurance coverage claims, Fireman's Fund ignored established insurance coverage case law in Oregon, including but not limited to *Farmers Insurance Co. v. Trutanich*, 123 Or App 6, 858 P. 2d 1332 (1993) (pervasive odor from a methamphetamine lab in a rental home was "accidental direct physical loss" despite the insurer's argument that odor is not "physical.").

130.    Fireman's Fund's refusal to pay Policy benefits to The Oregon Clinic for the losses claimed herein was unreasonable and without proper cause and therefore breached the covenant of good faith and fair dealing inherent in the Policy.

131.    By its conduct alleged above and herein, Fireman's Fund further breached the implied covenant of good faith and fair dealing arising out of the Policy including but limited to by:  (a) failing to perform a fair, objective, good faith and thorough investigation of The Oregon Clinic's claims; (b) failing to consider and follow guiding Oregon precedent concerning the insurance coverage principles at issue; (c) asserting coverage defenses that were legally and/or factually invalid; (d) adopting unduly restrictive interpretations of the terms of the Policy; (e) compelling The Oregon Clinic to initiate this litigation in order to recovery Policy benefits; and (f) on information and belief failing to adopt and implement reasonable standards for the prompt and correct investigation of The Oregon Clinic's claim.

## VIII. DEMAND FOR JURY TRIAL

The Oregon Clinic requests a jury trial on all claims so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, The Oregon Clinic prays for judgment in its favor and against Fireman's Fund as follows:

Page 37 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

a.      On its First Claim for Relief, for a judgment declaring that Fireman's Fund has breached the Policy and adopting each of The Oregon Clinic's contentions set forth in the above Claim for Declaratory relief;

b.      On its Second Claim for Relief, for judgment in favor of The Oregon Clinic and against Fireman's Fund in an amount to be proven at trial but not less than $20,647,000.

c.      On its Third Claim for Relief, for judgment in favor of The Oregon Clinic and against Fireman's Fund in an amount to be proven at trial;

d.      For prejudgment interest at the highest applicable statutory rate;

e.      For its reasonable attorney fees and costs incurred pursuant to applicable law including ORS 742.061; and

f.      For such other relief as the Court may deem proper.

DATED this 20th day of May, 2021.

MILLER NASH LLP

*s/ Seth H. Row*
Seth H. Row, OSB No. 021845
seth.row@millernash.com
Katelyn J. Fulton, OSB No. 183404
katelyn.fulton@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155

Attorneys for Plaintiff The Oregon Clinic, PC

Page 38 -    COMPLAINT

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204